IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Petitioner-Appellee | ) |
| | ) |
| | ) |
| | ) |
| v. | ) No. 24-3732 |
| | ) |
| EATON CORPORATION, | ) |
| | ) |
| Respondent-Appellant | ) |
| | ) |

**GOVERNMENT'S RESPONSE IN OPPOSITION TO
APPELLANT'S MOTION FOR A STAY PENDING APPEAL**

The United States of America, the appellee herein, respectfully

submits this opposition to appellant Eaton Corporation's motion for a

stay pending appeal of the District Court's order enforcing an IRS

summons. The Court should deny that motion because Eaton cannot

meet the strict requirements for obtaining a stay.

**INTRODUCTION**

This is a summary proceeding brought by the Government to

enforce an IRS summons. The IRS is investigating the impact on

Eaton's 2017–2019 taxes of a transfer of intellectual property between

Eaton and its Irish affiliate. This type of transaction can be exploited to

artificially minimize tax liability.  The IRS issued the summons to Eaton seeking performance evaluations for a discrete number of employees to assess their contributions to the intellectual property. Presently, 22 documents remain at issue.

When Eaton refused to comply with the summons, the IRS sought judicial enforcement.  The District Court enforced the summons over Eaton's objections that the evaluations were not relevant and that comity considerations precluded its compliance due to a broad European Union ("E.U.") privacy regulation.  Eaton now appeals and asks for the extraordinary relief of a stay pending appeal.  That motion should be denied.

First, Eaton cannot show that it is likely to succeed on its argument that the District Court abused its discretion in weighing the comity factors.  The most important factor—the balancing of the nations' interests—weighs "strongly" in the Government's favor because of its paramount interest in prompt, effective tax collection.  In contrast, Ireland and the E.U. have a diminished interest in protecting their residents' privacy given that the E.U. regulation has many exceptions and the IRS is required by law to keep records confidential.  The

District Court found the other factors were split, but even that was overly generous to Eaton.

Second, Eaton cannot show irreparable harm because—even if this Court reverses—the District Court could order the IRS to return the documents and not use the information.  Further, the prospect of any fine by the E.U. is highly speculative.  Eaton has *already disclosed* information about these *same* employees to the IRS but has never suggested that it was fined by the E.U. for doing so.  Nor has it cited any instance of the E.U. fining a company for complying with an American court's disclosure order.

Third, the public interest weighs heavily in favor of expeditious tax administration, as taxes are the "lifeblood of government."  *Bull v. United States*, 295 U.S. 247, 259 (1935).

## BACKGROUND

### A.    Statutory framework

"Congress 'endowed the IRS with expansive information-gathering authority' to monitor compliance with the internal revenue laws." *Byers v. IRS*, 963 F.3d 548, 552 (6th Cir. 2020) (quoting *United States v. Arthur Young & Co.,* 465 U.S. 805, 816 (1984)).  It gave the IRS "broad

latitude to issue summonses 'for the purpose of ascertaining the correctness of any return, making a return where none has been made, determining the liability of any person for any internal revenue tax . . . or collecting any such liability.'" *United States v. Clarke*, 573 U.S. 248, 250 (2014) (quoting Internal Revenue Code ("I.R.C." or "Code") § 7602(a) (26 U.S.C.)) (alteration marks omitted).  "The purpose of the statutes is not to accuse, but to inquire." *Byers*, 963 F.3d at 552 (citation omitted).

The IRS's summons power is "greater than that of a party in civil litigation" and "analogous to that of the grand jury and one which should be liberally construed." *United States v. McKay*, 372 F.2d 174, 176 (5th Cir. 1967).  The IRS may investigate "merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." *United States v. Powell*, 379 U.S. 48, 57 (1964) (citation omitted).  As such, some courts have characterized the summons power as a "license[ ] to fish." *E.g.*, *United States v. Giordano*, 419 F.2d 564, 568 (8th Cir. 1969).

To obtain judicial enforcement of a summons, the Government must satisfy the standards set forth in *Powell*, 379 U.S. at 57–58, by demonstrating that (1) the investigation is being conducted for a

legitimate purpose, (2) the information sought "may be relevant" to that investigation, (3) the information sought is not already in the IRS's possession, and (4) the administrative steps required by the Code have been followed.

"[T]his prima-facie burden 'isn't much of a hurdle'"—no inquiry into the IRS's reasons for investigating or showing of probable cause is required. *Byers*, 963 F.3d at 553 (citations omitted). "'[E]ven potential relevance' is sufficient" and there is no requirement that the IRS "conduct its investigations in the least intrusive way possible." *Id.* at 558 (citations omitted). The Government's burden is generally satisfied by the submission of an affidavit from the revenue agent who issued the summons. *Id.* at 556 (citations omitted).

"Once the prima-facie showing is made, the burden shifts to the taxpayer to demonstrate that enforcement of the summons would be an abuse of the court's process." *Id.* at 559–60 (citation and alteration marks omitted). The burden to do so "is a heavy one," which must be carried by "specific facts and evidence." *Id.* at 560 (citations omitted).

Although the summons power is "subject to the traditional privileges and limitations, any other restrictions . . . should be avoided

absent unambiguous directions from Congress." *Id.* at 556 (citation

omitted). Thus, as employee privacy concerns are not rooted in a

"traditional limitation," the IRS may use the summons power to seek

"private" employee information. *2121 Arlington Heights Corp. v. I.R.S.*,

109 F.3d 1221, 1225 (7th Cir. 1997). This is because the statute reflects

a "congressional policy choice *in favor of disclosure* of all information

relevant to a legitimate IRS inquiry." *Arthur Young*, 465 U.S. at 816.

**B.    Facts**

The IRS is conducting an audit to determine Eaton's tax liabilities

for the 2017–2019 tax years. (Decl., R. 1-1, #5.)[1] During those periods,

Eaton sold certain intellectual property rights to its Irish affiliate and

subsequently licensed those rights back from—and made royalty

payments to—the affiliate. (*See id.*) The IRS is investigating whether

those transactions were conducted on an arm's-length basis as required

by I.R.C. § 482's transfer-pricing requirements. (*See id.*); Treas. Reg.

(26 C.F.R.) § 1.482-1(b)(1). Based on its interviews with Eaton

employees, and on the performance evaluations it has already received

---

[1] "R." refers to the District Court's record entry number; "#" refers to the "PageID" numbers in the District Court's record; "Mot." refers to Eaton's motion; and "Ex. A" refers to the attached declaration.

of non-E.U. foreign employees, the IRS believes that the performance evaluations of Eaton's Irish employees "are likely to contain project-specific, contemporaneous documentation of employee roles and responsibilities" which "may help show what kind of control Eaton continued to exercise over the transferred intellectual property assets after they were transferred to a lower-tax jurisdiction (Ireland)." (Decl., R. 13-1, #88–89; Ex. A at 3–4.)

The IRS accordingly issued a summons to Eaton seeking, *inter alia*, performance evaluations for employees of Eaton's Irish affiliate. (Decl., R. 1-1, #9–12.) Specifically, 22 evaluations (relating to 14 employees) remain at issue. (*See* Brief, R. 12, #64; Notice, R. 36, #291.) The IRS determined which evaluations to seek based on information that Eaton had previously provided, including their names, job titles, authority level, and location. (Decl., R. 13-1, #89–90.)

After Eaton failed to comply, the Government brought this action to enforce the summons. (Pet., R. 1, #1–4.) The District Court referred the Government's petition to a magistrate, who recommended denying the petition because the Government failed to satisfy a heightened relevance standard that the magistrate determined applied to

performance evaluations.  (Report, R. 17, #114–15.)  After the Government objected, the District Court rejected the recommendation and enforced the summons.  (Opinion, R. 22, #162–79.)  It concluded that the magistrate had incorrectly applied a heightened relevance standard, as the IRS's summons authority is broader than civil discovery rules.  (*Id.* #167–68.)  The court also rejected Eaton's arguments that an E.U. regulation prevented it from complying, concluding that production of the documents would not violate the regulation and that even if it would, comity considerations weighed in favor of enforcing the summons.  (*Id.* #173–79.)  After Eaton moved to alter or amend the judgment, the court agreed that the regulation applied, but maintained that comity considerations weighed in favor of enforcement.  (Opinion, R. 39, #310–21.)  The court also denied Eaton's request for a stay pending appeal.  (*Id.* #321–23.)  Eaton now appeals and seeks a stay in this Court.

## ARGUMENT

"A stay is an 'intrusion into the ordinary processes of administration and judicial review,' and accordingly 'is not a matter of right, even if irreparable injury might otherwise result to the appellant.'" *Nken v. Holder*, 556 U.S. 418, 427 (2009) (citations omitted). Although the parties and the public have an interest in careful review and a meaningful decision, they are also generally entitled to the prompt execution of final orders. *Id.* Thus, "the heavy burden for making out a case for such extraordinary relief rests on the moving party." *Kentucky v. Biden*, 23 F.4th 585, 593 (6th Cir. 2022) (citations and alteration marks omitted).

The relevant factors for the courts to consider are: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Kentucky*, 23 F.4th at 593 (citation omitted). "[T]he movant must address each factor, regardless of its relative strength, providing specific facts and affidavits supporting assertions

that these factors exist." *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991). "The third and fourth factors merge when the Government is the opposing party." *Slyusar v. Holder*, 740 F.3d 1068, 1074 (6th Cir. 2014) (citation omitted). The District Court correctly found that the factors did not support a stay here. (Opinion, R. 39, #321–23.)

## A.    Likelihood of success

To prevail on this factor, the moving party must make a "*strong* showing that [it is] likely to succeed on the merits." *Ohio State Conference of NAACP v. Husted*, 769 F.3d 385, 389 (6th Cir. 2014) (citation omitted). Here, Eaton fails to make a strong showing that the District Court's decision was clearly erroneous. *Byers*, 963 F.3d at 552.

### 1.    The Government satisfied the *Powell* factors

The District Court correctly found that the Government made the prima facie showing required by *Powell*, 379 U.S. at 57–58. (*See* Opinion, R. 22, #163, 170 n.35.) Agent Griffith's declarations established that the IRS is examining Eaton's tax liability for the 2017–2019 years; that the evaluations might shed light on that investigation; that the IRS does not already have the evaluations; and that all

administrative steps were taken before the summons was issued.
(Decl., R. 1-1, #5–6; Decl., R. 13-1, #89.)

Although Eaton claimed that the evaluations were not "relevant," the District Court properly concluded that § 7602's standard, which is "less demanding" than civil discovery standards, was satisfied. (Opinion, R. 22, #168); *accord McKay*, 372 F.2d at 176. Indeed, the evaluations are likely to shed light on the foreign and domestic employees' relative contributions to the intellectual property. As the District Court recognized, they "are likely to contain information about employees' work on the intellectual property at issue in this IRS investigation." (Opinion, R. 22, #169 (citing Decl., R. 13-1, #88–89).) They may "quantify how much an employee matured a technology, track technology project milestones, or document how successfully an employee completed her projects." (*Id.*) That information, in turn, "could show how much control Eaton maintained over its intellectual property" after it was transferred to its affiliate and how much of that property's value should be attributed to Eaton. (*Id.* #170 (citing Decl., R. 13-1, #89)); *cf. Amazon.Com, Inc. v. Commissioner*, 148 T.C. 108, 145 (2017) (citing employee performance evaluations as evidence in

transfer-pricing case). And the outcome of the audit could result in billions of dollars of additional tax, penalties, and interest if the IRS determines that income associated with the assigned assets should be reallocated from the affiliate to Eaton. (Decl., R. 13-1, #88.)

### 2. Eaton failed to show an abuse of process

Once the Government made its prima facie showing, it became Eaton's "heavy" burden to show an abuse of process. *Byers*, 963 F.3d at 560. To that end, Eaton argued that the evaluations did not contain the information the Government sought because they were "not intended to document project-specific details." (Decl., R. 16-1, #105.) It also cited the IRS's refusal to accept "less-intrusive alternatives"—i.e., interviewing the employees (or their supervisors) in lieu of obtaining the documents. (Brief, R. 12, #67–68.)

The District Court properly rejected these arguments. (Opinion, R. 22, #170–72.) The mere fact that the evaluations' *primary* purpose was not to document "project-specific details" does not mean that they do not include that type of information. The Government established reason to believe that they may. (Decl., R. 13-1, #88–89; *see also* Ex. A at 3–4.) And the Government need not accept purportedly less-

intrusive alternatives.  *See Byers*, 963 F.3d at 558.  Consequently,

Eaton failed to establish an abuse of process.

### 3.    Eaton failed to show that compliance was barred by a recognized limitation

Eaton claims (Mot. 1) that the enforcement order will cause it to

violate an E.U. law known as the General Data Protection Regulation,

2016 O.J. (L 119) 1, https://perma.cc/28KY-E8DW [hereinafter "GDPR"].

That law restricts the use or disclosure of nearly any piece of

information relating to a natural person.  (*See* Mot. 7.)  As such, Eaton

contends that enforcement would violate principles of international

comity.  (Mot. 19–26.)  Below, the parties disputed whether that

regulation applied.  Although the District Court eventually concluded

that enforcement would violate the regulation,[2] it determined that

enforcement was still appropriate under a comity analysis.  (Opinion, R.

39, #314–21.)

It is "well settled" that foreign "blocking" statutes "do not deprive

an American court of the power to order a party subject to its

jurisdiction to produce evidence even though the act of production may

---

[2] The Government maintains that the regulation does not apply and reserves its right to advance that argument in its merits brief.

violate that statute." *Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Ct. for S. Dist. of Iowa*, 482 U.S. 522, 544 n.29 (1987) (citation omitted). Although the Supreme Court has never held that foreign law may bar enforcement of a proper IRS summons, courts have applied a comity analysis to determine whether they should order enforcement. *E.g.*, *United States v. Vetco Inc.*, 691 F.2d 1281, 1288–91 (9th Cir. 1981). "A comity analysis typically starts by determining whether a 'true conflict' exists between the implicated legal systems." *In re Sealed Case*, 932 F.3d 915, 931 (D.C. Cir. 2019) (citation omitted). "After this initial inquiry, the question is whether 'the factual circumstances' of the case at hand counsel against applying American law." *Id.* at 931 (citation omitted). "The party relying on foreign law has the burden of showing that such law bars production." *Vetco*, 691 F.2d at 1289 (citation omitted).

Courts refer to a "collection of factors . . . to delineate the 'inherently uncertain' borders set by the principles of comity." *Sealed Case*, 932 F.3d at 931–32. Given the "fact-bound" nature of the analysis, appellate courts review a district court's weighing of the factors for abuse of discretion. *Id.* at 934 (collecting cases); *accord*

*Chavez v. Carranza*, 559 F.3d 486, 495 (6th Cir. 2009).  Here, the District Court correctly found that the factors favored enforcement. (Opinion, R. 22, #176–79.)

### a.    Balancing the national interests

The District Court first considered the relevant countries' competing interests.  (Opinion, R. 22, #176–78.)  That is, "the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located."  *Societe Nationale*, 482 U.S. at 544 n.28.  As the District Court recognized, this is the "most important factor."  *United States v. Field (In re Grand Jury Proc.)*, 532 F.2d 404, 407 (5th Cir. 1976).

The court correctly found that "[t]he United States has a paramount interest in collecting taxes, including investigating potential underpayment."  (Opinion, R. 22, #177.)  Indeed, the public interest strongly favors prompt, effective tax collection.  (*Accord* pp. 26–27, *infra*.)  Other courts analyzing the comity factors in analogous circumstances have also found that interest determinative.  *See Vetco*, 691 F.2d at 1289  ("There is a strong American interest in collecting

taxes from and prosecuting tax fraud by its own nationals operating through foreign subsidiaries."); *Field*, 532 F.2d at 408 ("The collection of revenue is crucial to the financial integrity of the republic.").

And when, as is the case here, the other jurisdiction's "only interest is in protecting the privacy of its non-consenting domiciliaries," that interest is "diminished where the party seeking the records is the IRS, which is required by law to keep the information confidential." *Vetco*, 691 F.2d at 1289 (citing I.R.C. § 6103(a)).  Indeed, the IRS is already entrusted with highly personal information for millions of taxpayers and "[t]ax investigations often involve the pursuit of sensitive records."  *Polselli v. IRS*, 598 U.S. 432, 444 (2023).  Federal law prohibits IRS employees from disclosing return information except in narrow circumstances and generally imposes a need-to-know standard within the IRS for accessing taxpayer records.  *E.g.*, *White v. IRS*, 707 F.2d 897, 900 (6th Cir. 1983) (discussing I.R.C. § 6103).  And an IRS employee who willfully violates that law commits a felony punishable by up to five years' imprisonment.  *See* I.R.C. § 7213.  On top of those safeguards, the District Court entered a protective order that permits

redaction of irrelevant, but personal, information from the evaluations.
(*See* Opinion, R. 22, #178 n.64; Order, R. 30, #207–08.)

Moreover, a foreign nation's interest is further diminished when
its law "does not provide a blanket guarantee of privacy and has many
exceptions." *United States v. Davis*, 767 F.2d 1025, 1035 (2d Cir. 1985).
Here, the E.U. regulation includes several exceptions specifically
authorizing parties to share information with non-E.U. countries. *See*
GDPR, art. 49(1), at 64. And it recognizes that "not all privacy interests
are the same," requiring more restrictive rules for "personal data about
race, ethnicity, religion, and health." (Opinion, R. 39, #319.) And even
if not strictly applicable, the "public interest derogation"—an
exception—"allows European entities to send personal data abroad to
serve interests found in an EU member state's treaty." (Opinion, R. 22,
#177.) And significantly, Eaton has not cited a single case where an
American court barred disclosure because it would violate the
regulation. A law that is "'hardly a blanket guarantee of privacy' does
not present a [foreign] interest sufficient to outweigh the United States'
interest in collecting revenues and insuring an unimpeded and
efficacious [investigatory] process." *United States v. Bank of Nova*

*Scotia* (*In re Grand Jury Proc.*), 691 F.2d 1384, 1391 (11th Cir. 1982) (citation omitted).

Furthermore, as the District Court also acknowledged, the U.S.-Ireland tax convention shows that Ireland "has an interest in cooperating with the United States to ensure that taxes are appropriately allocated between the two countries." (Opinion, R. 22, #177 (discussing Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income and Capital Gains, Ir.-U.S., July 28, 1997, S. Treaty Doc. No. 105-31).)[3] The existence of the "public interest derogation" further indicates that "Ireland's treaty-based interests at least significantly mitigate" the privacy interests of its domiciliaries. (*Id.* #177–78.) And "the absence of any objection" by Ireland or the E.U. "is significant" as foreign

---

[3] Nor was it error for the District Court to consider Ireland's interests (*cf.* Mot. 20). The E.U. regulation explicitly takes the law of the member state—including international conventions that it is a party to—into account when considering whether exceptions apply. GDPR art. 49(4) & 49(5), at 65; European Data Protection Board, *Guidelines 2/2018 on derogations of Article 49 under Regulation 2016/679*, at 10 (2018), https://perma.cc/J2YC-UNB2. Likewise, it was not error (*cf.* Mot. 20) for the court to look up the convention without being specifically directed to it given that it had "an independent responsibility to analyze the applicable" authorities. *Bower v. Fed. Exp. Corp.*, 96 F.3d 200, 209 n.14 (6th Cir. 1996).

governments "have not hesitated to make known their objections" when they consider "their vital national interests threatened." *Davis*, 767 F.2d at 1035 (citation omitted).

Moreover, unlike a "private suit," there is a "statement implicit in the filing of the suit" by the Government that the Executive Branch has determined that any adverse diplomatic consequences "ha[ve] been outweighed" by the benefits of disclosure. *Vetco*, 691 F.2d at 1289 n.9. In such circumstances, deference is due to "the arm of the government charged with primary responsibility for formulating and effectuating foreign policy." *Davis*, 767 F.2d at 1035.

In sum, the District Court correctly found that this factor "weighs strongly in favor of enforcing the IRS summons." (Opinion, R. 22, #178.)

### b.    Remaining factors

The District Court properly found that, even giving Eaton some benefit of the doubt, the other factors did not outweigh the balancing of the national interests (the most important factor). (Opinion, R. 22, #178–79.) Indeed, the District Court's evaluation of the remaining factors was, if anything, too generous to Eaton.

1.    "[T]he importance to the litigation of the documents . . .
requested."  *Societe Nationale*, 482 U.S. at 544 n.28 (original ellipsis
omitted).  This factor—and not the balancing of the interests (*cf.* Mot.
21)—considers whether the records are important "to the requesting
party" or are "cumulative of records already produced."  *Vetco*, 691 F.2d
at 1290.

Here, the Government demonstrated that the records were
relevant to the investigation and there has been no showing that the
IRS already possesses similar records.  *Cf. id.*  Although the IRS shared
with Eaton an economist's "draft" report, including a "preliminary"
conclusion regarding the transfer of intellectual property (and
addressing many other issues not implicated here), it has *not* proposed
changes to Eaton's tax reporting regarding that transaction, as Eaton
implies.  (*Compare* Ex. A at 2–3, *with* Mot. 15, 27.)  The IRS shared that
document to try to work cooperatively with Eaton because *it has not
completed its investigation*.  (*See* Ex. A at 2–3.)  Regardless, the stage of
the investigation does not limit the IRS's summons power.  *Cf. Byers*,
963 F.3d at 556.  Nevertheless, the District Court weighed this factor in

Eaton's favor, believing that the evaluations were not critical to the investigation.  (Opinion, R. 22, #178.)

2.      "[T]he degree of specificity of the request." *Societe Nationale*, 482 U.S. at 544 n.28.  The District Court correctly recognized that this factor favors the Government because the summons seeks "a discrete and narrow document set." (Opinion, R. 22, #178.)  Indeed, only 22 documents remain at issue.  Even Eaton does not contest this factor.  (Brief, R. 32-1, #224; Mot. 25–26.)

3.      "[W]hether the information originated in the United States." *Societe Nationale*, 482 U.S. at 544 n.28.  Courts have also found it significant when "[p]roduction to the IRS will take place in this country."  *Vetco*, 691 F.2d at 1290; *accord Bank of Nova Scotia*, 691 F.2d at 1390.  The District Court assumed that "the performance evaluations were created in Europe," and weighed this factor in Eaton's favor, even though the record is silent on the origin of the evaluations and production would take place in the United States.

4.      "[T]he availability of alternative means of securing the information." *Societe Nationale*, 482 U.S. at 544 n.28.  "[A]lternative information-gathering means that 'may limit the information

obtainable by the IRS' or that take more time and money than an IRS summons are not substantially equivalent."  (Opinion, R. 39, #320 (quoting *Vetco*, 691 F.2d at 1290).)

Eaton argued that the Government should have interviewed its employees (or their supervisors) instead of seeking the evaluations. (Brief, R. 32-1, #221.)  But as the District Court found, "[b]ecause of fading memories, interviews may limit the information available to the IRS compared to contemporaneous documents" and would "take significantly more time and greater resources than reviewing performance evaluations would."  (Opinion, R. 39, #320.)  As the District Court also noted, interviews and documents generally fulfill "different, albeit complementary, roles in investigations" and are not interchangeable.  (*Id.* #320 n.42.)

The Government had every right to prefer contemporaneous documents over interviews and written answers.  Indeed, *courts* prefer contemporaneous records to statements after-the-fact.  *E.g.*, *Briggs v. Univ. of Cincinnati*, 11 F.4th 498, 513 (6th Cir. 2021) (post-hoc explanations in affidavit were not credible when contradicted by contemporaneous documentary evidence); *Merck & Cie v. Watson*

*Lab'ys, Inc.*, 822 F.3d 1347, 1354 (Fed. Cir. 2016) (similar); *New Jersey v. EPA*, 703 F.3d 110, 114 (D.C. Cir. 2012) (similar).  And a taxpayer may not dictate how the IRS conducts its investigations.  *See Byers*, 963 F.3d at 558.  Thus, the fourth factor weighed in favor of enforcement and the comity analysis favored enforcement.  (Opinion, R. 22, #178–79; Opinion, R. 39, #319–21.)

Consequently, Eaton cannot establish that the District Court abused its discretion in weighing the comity factors[4] or that it is likely to prevail on appeal.

## B.    Irreparable harm

To carry its burden, the stay movant must show that it "will suffer more than a mere 'possibility' of irreparable harm."  *Husted*, 769 F.3d at 389 (citation omitted).  "The possibility that adequate compensatory or

---

[4] The District Court also correctly indicated that Eaton had forfeited its belated argument that the court should consider "good faith" as an additional factor.  (Opinion, R. 39, #320–21); *accord Thurman v. Yellow Freight Sys., Inc.*, 97 F.3d 833, 835 (6th Cir. 1996).  Moreover, although good faith may be relevant when determining whether to impose sanctions in a contempt proceeding, it does not "*justify* noncompliance with legal obligations."  (Opinion, R. 39, #321) *see also Restatement (Third) of Foreign Relations Law* § 442 cmt. h (1987).  Here, nothing in the record indicates that Eaton has made a "good faith" effort to avoid the alleged conflict with foreign law.  *Cf. Sealed Case*, 932 F.3d at 939.

other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Griepentrog*, 945 F.2d at 154 (citation omitted). "In addition, the harm alleged must be both certain and immediate, rather than speculative or theoretical." *Id.* To prevail, "a movant must provide some evidence that the harm has occurred in the past and is likely to occur again." *Id.*

The Supreme Court has held that complying with a summons does not moot an appeal of an enforcement order because the district court can still provide relief to a successful appellant. *See Church of Scientology of California v. United States*, 506 U.S. 9, 12-13, 17 (1992). Specifically, courts can order "the Government to destroy or return any and all copies it may have in its possession." *Id.* at 13.

Citing *Church of Scientology*, district courts have routinely found that no irreparable injury would result from the denial of a stay pending appeal of a summons-enforcement order. *E.g., United States v. Jud. Watch, Inc.*, 241 F. Supp. 2d 15, 17 (D.D.C. 2003), *aff'd*, No. 03-5019, 2003 WL 1089413, at *1 (D.C. Cir. Mar. 6, 2003); *United States v. Lee, Goddard & Duffy, LLP*, 553 F. Supp. 2d 1164, 1168 (C.D. Cal. 2008); *Lyons Trading, LLC v. United States*, No. 3:07-MC-13, 2008 WL

918503, at *3 (E.D. Tenn. Apr. 3, 2008); *United States v. Diversified Grp., Inc.,* No. M 18-304, 2002 WL 31812701, at *1 (S.D.N.Y. Dec. 13, 2002). Consequently, if Eaton provides documents, and the enforcement order is subsequently reversed, the District Court will be able to provide relief such as ordering the IRS to return the documents and barring it from using the information.

Although Eaton also claims that it may be fined by the E.U., that alleged harm is entirely speculative. Even assuming that disclosure of the evaluations would violate the E.U. regulation, by the same token, Eaton's prior disclosure of employee names, titles, rank, and location also violated the same regulation. (*See* Decl., R. 33-1, #249–50.) Yet Eaton has not shown or even alleged that it was fined for those disclosures. Indeed, it is difficult to imagine that the "supervisory authority" would exercise its discretion, *see* GDPR art. 83(2), at 82, to punish Eaton for complying with the valid order of an American court with jurisdiction over it. (*Cf.* Opinion, R. 39, #322–23 (finding that any fine is likely to be "small" and a violation may only result in "a reprimand.") Eaton has cited no instance in which any corporation has been fined for making a court-ordered disclosure. It has thus failed to

show "that the harm has occurred in the past and is likely to occur again." *Griepentrog*, 945 F.2d at 154. In short, Eaton has failed to demonstrate anything more than a "mere possibility" of harm.

### C. Injury to other parties and the public interest

The final factors also weigh against a stay, as a stay would frustrate the Government's "need to assess and collect taxes as expeditiously as possible with a minimum of preenforcement judicial interference." *Bob Jones Univ. v. Simon*, 416 U.S. 725, 736 (1974).

The summons, which was served well over a year ago (Decl., R. 1-1, #9 ), seeks information regarding the 2017–2019 tax years. Summons enforcement proceedings are supposed to be "summary in nature," *Clarke*, 573 U.S. at 254, and "concluded quickly, so that the investigation may advance toward the ultimate determination of civil or criminal liability, if any," *United States v. Kis*, 658 F.2d 526, 535 (7th Cir. 1981), *abrogated on other grounds by Church of Scientology*, 506 U.S. 9. Moreover, a stay would subject the Government to potential harm from the possible loss of documents, fading memories, or unavailability of witnesses, and could also limit follow-up opportunities.

- 27 -

*See, e.g., Jud. Watch*, 241 F. Supp. 2d at 18; *Diversified Grp.*, 2002 WL 31812701, at *2.

As this Court has recognized, policy considerations support the "federal government's interest in prompt, effective tax collection." *United States v. Crestmark Bank*, 412 F.3d 653, 657 (6th Cir. 2005). "[T]axes are the lifeblood of government, and their prompt and certain availability an imperious need." *Bull*, 295 U.S. at 259. Impeding their assessment and collection only serves to "shift[ ] heavier burdens to honest taxpayers." *Clarke*, 573 U.S. at 254 (citation omitted). Accordingly, the public interest favors denial of the motion.

## CONCLUSION

For the foregoing reasons, Eaton's motion for a stay pending appeal should be denied.

Respectfully submitted,

DAVID A. HUBBERT
  *Deputy Assistant Attorney General*

/s/ Douglas C. Rennie

MICHAEL J. HAUNGS                    (202) 514-4343
DOUGLAS C. RENNIE                    (202) 305-7546
  *Attorneys*
  *Tax Division*
  *Department of Justice*
  *Post Office Box 502*
  *Washington, DC 20044*
  *Appellate.TaxCivil@usdoj.gov*
  *Douglas.C.Rennie@usdoj.gov*

Dated: September 9, 2024

Ex. A

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Petitioner-Appellee | ) | |
| | ) | |
| | ) | |
| | ) | |
| v. | ) | No. 24-3732 |
| | ) | |
| EATON CORPORATION, | ) | |
| | ) | |
| Respondent-Appellant | ) | |
| | ) | |

**DECLARATION OF SENIOR REVENUE AGENT
KEITH S. GRIFFITH II**

I, Keith S. Griffith II, pursuant to 28 U.S.C. § 1746, declare as

follows:

1.      I am a duly commissioned Senior Revenue Agent employed

in the Internal Revenue Service's Transfer Pricing Operations group,

Large Business & International Division, 1919 Smith Street, Houston,

Texas 77002.

2.      In my capacity as Senior Revenue Agent, I am conducting an

investigation into the federal tax liability of Eaton Corporation

("Eaton") for the 2017, 2018, and 2019 tax years.

- 2 -

3.     In my group, we attempt to work cooperatively and transparently with taxpayers on audits.  We provide status updates, documents, preliminary analysis, and draft reports to taxpayers at various stages of the audit as part of that process.  This process helps to narrow the issues and ensure there is sufficient factual support for our conclusions.

4.     In March and April of 2024, the IRS shared certain materials with Eaton as part of that collaborative and transparent spirit.  Most of those materials address transfer-pricing issues that are unrelated to Eaton's transfer of intellectual property to its Irish affiliate.  The materials did include an economist's draft report, which contains an incomplete economic analysis addressing that transaction.  That report also included a preliminary conclusion regarding the transaction based on the facts known to that date.  But on nearly every page, the report indicates that it is a "Draft" that is "preliminary" and "subject to refinement."  We invited Eaton to provide additional facts in response to these materials.

5.     The IRS has not reached a conclusion regarding the intellectual-property transfer, has not issued a draft Form 886-A

(Explanation of Adjustment) regarding the transfer, and has not proposed changes to Eaton's tax reporting with respect to the transfer. The audit is ongoing.

6.    The IRS is seeking the employee evaluations at issue in this case because, based on its interviews of Eaton employees, it believes that they are likely to contain project-specific, contemporaneous documentation of employee roles and responsibilities for the employees at issue related to Eaton's transfer of intellectual property to its Irish Affiliate.  The outstanding evaluations relate to employees who work for the Irish Affiliate or are otherwise located in the European Union.  I believe this kind of information may be relevant to the audit because it may help show what kind of control Eaton continued to exercise over the transferred intellectual property assets after they were transferred to a lower-tax jurisdiction (Ireland).

7.    In partial compliance with the District Court's enforcement order, Eaton provided evaluations for two employees that were based in India.  They contain the type of information that the IRS has been seeking regarding the intellectual property, including employee projects relating to the technology and employee contributions to the

development, enhancement, maintenance, protection, exploitation, direction, and control of the technology. This is the type of information that we were led to believe would be in the unproduced evaluations based on our interviews of Eaton employees and will assist us in completing the audit.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 6th day of September, 2024.

_K S G_____

KEITH S. GRIFFITH II

## Certificate of Compliance with Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

Case No. __24-3732__

1.  This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) and the word limit of Fed. R. App. P. 27(d)(2) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

[X]    this document contains __5,196__ words, or

[ ]    this brief contains __***__ words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), or

[ ]    this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[ ]    this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 13-point Century Schoolbook, or

[X]    this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Century Schoolbook, or

[ ]    this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

(s) /s/ Douglas C. Rennie_____

Attorney for __United States of America_____

Dated: __September 9, 2024_____

## CERTIFICATE OF SERVICE

It is hereby certified that I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system on September 9, 2024. I further certify that CM/ECF system will serve counsel for the appellant, who are registered CM/ECF users.


 /s/ Douglas C. Rennie
DOUGLAS C. RENNIE
*Attorney*